ATTORNEY FOR THE RESPONDENT
Paul J. Watts
Spencer, Indiana

ATTORNEYS FOR THE INDIANA SUPREME COURT
DISCIPLINARY COMMISSION
Donald R. Lundberg, Executive Secretary
Seth T. Pruden, Staff Attorney
Indianapolis, Indiana

---

# In the
# Indiana Supreme Court



**FILED**

May 14 2008, 2:02 pm

**CLERK**
of the supreme court,
court of appeals and
tax court

No. 53S00-0607-DI-248

IN THE MATTER OF:

DAVID J. COLMAN,

*Respondent.*

Attorney Discipline Action

**May 14, 2008**

**Per Curiam.**

This matter is before the Court on the report of the hearing officer appointed by this Court to hear evidence on the Indiana Supreme Court Disciplinary Commission's "Verified Complaint for Disciplinary Action," and on the post-hearing briefing by the parties. We find that Respondent, David J. Colman, engaged in attorney misconduct by participating in preparation of a will for a non-relative that would give Respondent or his son a substantial gift, by representing a client when there was a conflict of interest due to Respondent's personal interests, by failing to hold property of a client separate from Respondent's property and failing to keep a client's funds in a clearly identified trust account, by entering into an improper business transaction with a client, and by charging an unreasonable fee.

The Respondent's 1970 admission to this state's bar subjects him to this Court's disciplinary jurisdiction. See IND. CONST. art. 7, § 4. For his misconduct, we find that Respondent should be suspended from the practice of law in this state for at least three years.

## Background

On July 6, 2006, the Indiana Supreme Court Disciplinary Commission filed a Verified Complaint against Respondent in three counts. The hearing officer appointed in this case, Leslie C. Shively, conducted a hearing, and on May 18, 2007, he filed a report containing the following findings of fact, which this Court concludes are supported by the evidence and therefore accepts.

Count 1. Respondent first became acquainted with G.A., an elderly man who lived alone in a trailer, when Respondent represented him in a civil lawsuit. In 2004, G.A. fell, broke his hip, and was hospitalized. While in the hospital, G.A. called Respondent, who came to the hospital and discussed G.A.'s desire to have a will. G.A. told Respondent he wanted Respondent to be his beneficiary.

Respondent contacted his friend, attorney Paul Watts, to prepare the will. Respondent gave Watts the information to include in the will, including naming Respondent as primary beneficiary and Respondent's son as contingent beneficiary. Watts prepared the will according to the information provided by Respondent. Watts did not discuss the contents of the will with G.A., nor did he charge G.A. for his services. Watts' entire file for G.A. consisted of an empty file folder and a post-it note. Watts did not attempt to ascertain G.A.'s mental competence. Respondent, however, obtained a written statement from a psychiatrist stating he found G.A. to be competent to sign the will. On April 28, 2004, a paralegal for Watts came to the hospital with the draft of the will. Respondent consulted privately with G.A. Then the paralegal went over the will with G.A., and with the paralegal's approval, he initialed a handwritten notation on the will indicating he could change the will if he desired. He then executed the will.

A little more than a week later, on May 6, 2004, Respondent, as petitioner, filed a petition for appointment of a guardian over the person and estate of G.A., alleging him to be incapacitated. Filed with the petition was a "Consent to the Appointment of Guardian," prepared by Respondent and signed by G.A. Respondent was the only attorney to advise G.A. about giving his consent to the guardianship. Respondent was appointed guardian on May 10, 2004. Respondent moved G.A. from the hospital to a nursing facility. About three weeks after the

2

guardianship was established, however, G.A. decided he wanted to leave the facility. At some point, G.A. retained new counsel through the assistance of a friend and challenged his guardianship. Respondent was an adverse party against G.A. at the hearing on this matter.

Count 2. The hearing officer found in Respondent's favor on this count.

Count 3. In the 1970's, M.M. was convicted of armed robbery and served time in the state prison at Michigan City. M.M. later graduated from college and began graduate school in Bloomington, Indiana, where he owned a condominium. In late 1994 or early 1995, M.M. was arrested in Evansville on a possession of marijuana charge. Around that same time, M.M. was involved in a dispute with Indiana University regarding his grade in a course he had taken. Respondent represented M.M. in both of these matters. For both of these matters, Respondent had no written fee agreement with M.M., the terms of the representation were not clearly established, Respondent did not submit a bill for his services to M.M., and he never told M.M. what he was owed.

On March 31, 1995, M.M. was again arrested after a confidential informant made a controlled purchase of marijuana from M.M. Federal and State authorities discovered 100 pounds of marijuana and between $150,000 and $200,000 in cash on M.M.'s property. The authorities failed to discover approximately $20,000 in cash hidden in his condominium and $30,000 in cash in a bank safe deposit box.

When Respondent visited M.M. in the Monroe County jail shortly after he was arrested, M.M. told him about the undiscovered money, and Respondent volunteered to recover the cash. It was understood that Respondent would handle the state criminal charges and attorney R.K. would handle the federal charges.

On or about April 3, 1995, Respondent retrieved the undiscovered cash and deposited the entire sum ($50,700) into his personal account at the Indiana University Credit Union. The account was not an attorney trust account and contained Respondent's own funds at the time he deposited M.M.'s funds into it.

Respondent suggested that M.M. transfer ownership of his condominium to him to avoid a forfeiture due to the criminal charges. One purpose was to use equity from the condominium to help pay legal fees. M.M. testified that a second purpose was to allow him eventually to reclaim the condominium. On April 21, 1995, Respondent presented to M.M. at the Marion County jail a "Sale Agreement" that he had prepared. Paragraph 1 of the Sale Agreement stated:

> [The] purchase price shall be constituted by David J. Colman's assumption of the existing balance due on the condominium . . . in the amount of $44,857.80. In addition, David J. Colman will forego attorney's fees for representing [M.M.'s] interests in relation to Indiana University, criminal charges in Monroe County, and assisting in a pending Federal Criminal Prosecution, and will forego all fees incurred in the future concerning these matters.

The Sale Agreement also provided for the transfer of the condominium's contents to Respondent. The Sale Agreement stated M.M. would reimburse Respondent for all his expenditures concerning the condominium if it were subject to successful forfeiture.

Respondent did not request an appraisal of the condominium or its contents. At the time of the Sale Agreement, M.M. had not been given any estimate of the future legal fees, and the hearing officer found that the amount of Respondent's future legal fees was entirely speculative. According to M.M., the condominium was worth approximately $95,000 to $98,000 and the value of the contents was $15,000, yielding a net equity of both of about $65,000. Respondent did not advise M.M. to seek independent counsel regarding the transaction. Respondent told M.M. not to tell anyone about it, and M.M. did not even mention the Sale Agreement to attorney R.K. Respondent did not formally assume the mortgage on the condominium, nor did he make timely payments.

R.K. represented M.M. in a federal forfeiture proceeding, which was eventually resolved by agreement. In the federal criminal action, M.M. entered into a plea agreement and went to prison. M.M. has asked Respondent to either return the condominium or make some payment for the net value, and Respondent has refused.

Aggravating factors. The hearing officer found the following aggravating facts: (a) Respondent has demonstrated a pattern of misconduct; (b) Respondent's conduct in part was

4

based upon selfish and dishonest motives; (c) Respondent engaged in multiple violations; (d) Respondent was dealing with a vulnerable client in the case of G.A.; and (e) Respondent has refused to acknowledge any wrongdoing. In addition, Respondent has the following disciplinary history:

> Matter of Colman, 476 S 55 (Ind. 1978). Respondent received an agreed private reprimand for communicating directly with a represented party in a personal injury action.

> Matter of Colman, 53S00-9410-DI-981 (Ind. September 29, 1995). The Court approved an agreed private reprimand for lending a client $3000 with annual interest between 9 and 12 percent without advising the client of her option of seeking independent counsel before signing the promissory note.[1]

> Matter of Colman, 53S00-9606-DI-457. On June 14, 1996, the Respondent pled guilty to one count of filing a false tax return, a federal felony. On Respondent's consent to discipline, the Court suspended Respondent from the practice of law for at least 18 months. See 691 N.E.2d 1219 (Ind. 1998). Respondent was reinstated on February 10, 1999. See 714 N.E.2d 125 (Ind. 1999).

Mitigating factors. The hearing officer noted Respondent's legal skill and the fact that M.M. was not an innocent victim of the transaction involving the condominium. Indeed, M.M. testified in the federal forfeiture action that he no longer had any interest in the condominium. His position in the current case—that he and Respondent had a side deal to shield the condominium from forfeiture and allow M.M. to reclaim it later if they were successful—seems to be a confession of fraud and perjury in the forfeiture action.

## Discussion

Count 1—Will Preparation. Although attorney Watts actually put G.A.'s will to paper, the circumstances of how this came about support a finding that Respondent actively participated in the preparation of the will, under which he was the primary beneficiary and his son was the contingent beneficiary. The Court concludes Respondent violated Professional Conduct Rule 1.8(c), which prohibits a lawyer from preparing an instrument for a non-relative that gives the lawyer or a person related to the lawyer a substantial gift.

---

[1] As a fact in mitigation, the conditional agreement stated Respondent had no prior disciplinary action since his admission to the bar in 1970, which is untrue in light of his 1978 private reprimand.

Count 1—Guardianship Proceeding. Respondent contends his participation in the guardianship proceeding was as G.A.'s guardian, not as his attorney. Respondent, however, obtained G.A.'s consent to the guardianship and initiated the action just a few days after G.A. executed the will—an action G.A. initiated by contacting Respondent as his lawyer. In the guardianship petition, Respondent explicitly states he is G.A.'s attorney. These and other circumstances, such as Respondent's handling of other legal matters for G.A., indicate G.A. considered Respondent to be his attorney during this period. By becoming G.A.'s guardian, Respondent was put in charge of property he stood to inherit under G.A.'s will, which could have provided an incentive to preserve the property rather then expending it for G.A.'s care and comfort. Even though the court in the guardianship matter found Respondent had not acted improperly as G.A.'s guardian, Respondent violated Rule 1.7(b), which prohibits an attorney from representing a client when there is a concurrent conflict of interest due to the lawyer's personal interests.

Count 3—Handling of Client's Funds. By failing to deposit M.M.'s funds in a designated trust account and by commingling M.M.'s funds with his own funds, the Court concludes Respondent violated Professional Conduct Rule 1.15(a) and Admission and Discipline Rule 23(29)(a), which require a lawyer to hold property of a client separate from the lawyer's own property and to keep a client's funds in a clearly identified trust account.

Count 3—The Condominium Transaction. The hearing officer found that the Sale Agreement was unreasonable because it did not set out the value of services Respondent would perform, and that Respondent's charge of $65,000 for the representation was unreasonable. By entering into this agreement, Respondent violated Professional Conduct Rule 1.8(a), which prohibits a lawyer from entering into a business transaction with a client unless the terms are fair and reasonable, the terms are fully and clearly disclosed, the client is given reasonable opportunity to seek independent counsel, and the client consents in writing to the transaction. By accepting the condominium and its contents in exchange for the value of legal services that were either unknown or substantially less than the value of the transferred property, Respondent violated Rule 1.5(a), which prohibits a lawyer from charging an unreasonable fee.

<u>Sanction</u>.  Respondent's individual ethical violations are troublesome, but in the aggregate they raise the larger concern that Respondent fails to understand and honor the fundamental principles of the attorney-client relationship.  Rather than seeing the relationship as one of undivided loyalty to the client, Respondent appears to view that relationship as a chance for personal financial gain wholly apart from compensation for legal services rendered whenever the opportunity arises.  Moreover, Respondent displays a cavalier attitude toward the ethics rules intended to protect clients in transactions with their lawyers.

"Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."  Prof. Cond. R. 1.7 cmt. 1.  If a will provides for an attorney to receive a substantial gift from a non-relative, "the client should have the detached advice that another lawyer can provide."  Prof. Cond. R. 1.8 cmt. 7.  "A lawyer's legal skill and training, together with the relationship of trust and confidence between lawyer and client, create the possibility of overreaching when the lawyer participates in a business, property or financial transaction with a client . . . ."  Prof. Cond. R. 1.8 cmt. 1.

In the matter involving G.A., Respondent ignored his ethical duties by participating in the preparation of a will under which he was the primary beneficiary.  Even if G.A. was competent to execute a will, his frailty and vulnerability were demonstrated by Respondent's filing of a guardianship proceeding, as G.A.'s attorney, just days after the will's execution.  In the matter involving M.M., Respondent entered into an unreasonable business transaction/fee arrangement with a client—an ethical violation in itself.  Moreover, Respondent failed to observe ethically mandated client safeguards, including failing to ensure the client was given a reasonable opportunity to seek independent counsel regarding this transaction and failing to hold the client's funds separate from his own in a trust account.  Respondent fails to acknowledge any breach of duty in either of these cases.  In addition to the current charges, Respondent has a history of other ethical violations, including making an improper loan to a client and committing a federal felony.

The Court concludes Respondent should be suspended from the practice of law in this state for at least three years, after which he may be readmitted to the bar only if he proves by clear and convincing evidence, among other things, genuine remorse for his misconduct, a proper

understanding of the ethical standards imposed on members of the bar, and his willingness to conduct himself in conformity with such standards. *See* Admis. Disc. R. 4(b).

## Conclusion

For Respondent's professional misconduct, the Court suspends Respondent from the practice of law in this state for a period of not less than three years, beginning July 1, 2008. Respondent shall not undertake any new legal matters between service of this order and the effective date of the suspension, and Respondent shall fulfill all the duties of a suspended attorney under Admission and Discipline Rule 23(26). At the conclusion of that period, Respondent may petition this Court for reinstatement to the practice of law in this state, provided Respondent pays the costs of this proceeding, fulfills the duties of a suspended attorney, and satisfies the requirements for reinstatement of Admission and Discipline Rule 23(4).

The costs of this proceeding are assessed against Respondent. The hearing officer appointed in this case is discharged.

The Court directs the Clerk to forward a copy of this opinion to the hearing officer, to the parties or their respective attorneys, and to all other entities entitled to notice under Admission and Discipline Rule 23(3)(d).

Sullivan, Boehm, and Rucker, JJ., concur. Shepard, C.J., and Dickson, J., dissent as to sanction with separate opinions.

8

**Shepard, Chief Justice, dissenting as to sanction.**

This is respondent David J. Colman's fourth disciplinary proceeding; three of these have occurred since I became a member of this tribunal. The most recent of these involved very substantial federal tax evasion, a federal felony conviction, and an eighteen-month suspension of Respondent's license.

When Respondent's application for reinstatement was before us in 1999, I voted to readmit him. I was satisfied with the conclusions reached by all but one of the members of the Disciplinary Commission that Respondent was genuinely remorseful about his misconduct, that he understood the nature of it, and that he could safely be recommended to the public as a person fit to represent them. The present misconduct involves two different clients with very different legal matters, but Respondent's approach to both of these, as today's opinion says, suggests that he saw the lawyer-client relationship "as a chance for financial gain if the opportunity arises."

I see Respondent's violations in the two present counts as quite serious, and in light of the fact that this is Respondent's fourth disciplinary proceeding, I have given much thought to whether the appropriate sanction is a suspension of three years or disbarment.

I spent considerable time going behind the briefs Respondent's lawyer has filed with us, the stern theme of which is that Respondent did not violate any of the Rules of Professional Conduct. Sometimes, one's advocate advances a position or defense more forcefully than the client's own assessment might reflect. I hoped to learn that Respondent might harbor some doubt about the choices he made.

It was not to be so. Respondent's testimony before the Hearing Officer, the affidavits he made for purposes of this proceeding, and the letters from him and others revealed an insistence that he acted in accord with the letter and spirit of the rules.

Having had several years to reflect on how he handled the will and guardianship of a man in his mid-nineties whom Respondent knew to be infirm, Respondent reasserted on the stand that he saw no possibility that this dual role might limit his representation or present any conflict.

"Not that I could see or can see." "No, absolutely none." This posture of total denial is similarly reflected in Respondent's contention that his elderly client's will was not really handled by Respondent but was rather under the care of attorney Watts, who never met, or spoke, or corresponded with the testator.

Respondent has taken a similar position about the client in Count III, himself hardly an angel. The reasonableness of Respondent's fees for that client's several matters and the transparency of the fee arrangement seems to be measured only by the value of the assets that could be mustered, whether it was by transferring the condominium or retrieving $20,000 in a paper bag on top of the client's water heater (missed by the state and federal officers who searched the premises). Asked on the stand about how the reasonableness of his fee might be analyzed, Respondent finally said a reasonable fee was "[a]nything anybody will pay."

It is difficult to imagine that any future expressions of remorse about these actions could be persuasive, such that readmission might occur. And, it is hard to fashion an argument for the public that Respondent's behavior has been such that we might at some future date want, again, to tell clients they can entrust their own dearest matters to him. I thus vote to disbar.

**Dickson, Justice, dissenting as to sanction.**

When the respondent was convicted of a federal felony in 1996, this Court unanimously voted not to disbar but only to suspend his privilege to practice law for a substantial time. Matter of Colman, 691 N.E.2d 1219 (Ind. 1998). And we later unanimously agreed to reinstate him. Matter of Colman, 714 N.E.2d 125 (Ind. 1999).

On reflection, I should have, but did not, dissent to these *per curiam* decisions. I choose, however, not to make the same mistake a third time, and agree with Chief Justice Shepard that the respondent should be disbarred for his misconduct.